# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673

---

| | |
|---|---|
| Caption in Supreme Court: | THE HOPE CLINIC FOR WOMEN, LTD., *et al.*, Appellees, v. MANUEL FLORES, Acting Secretary of the Illinois Department of Financial and Professional Regulation, *et al.*, Appellants (Stewart Umholtz, State's Attorney, Tazewell County, Illinois, *et al.*, Proposed Intervening Appellants). |
| Docket Nos. | 112673, 112704 cons. |
| Filed | July 11, 2013 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Illinois' Parental Notice of Abortion Act of 1995, which was found valid by a federal court in 2009 and has never been enforced, was upheld against facial challenges raised under the Illinois Constitution of 1970 based on due process, equal protection, privacy and gender equality. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Daniel A. Riley, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part.<br>Circuit court judgment affirmed. |

Counsel on
Appeal

Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, Jane Elinor Notz, Deputy Solicitor General, and Brett Legner, Assistant Attorney General, of Chicago, of counsel), for appellants.

Kathleen L. Roach, Rachel B. Niewoehner, Geeta Malhotra and Dan Craig, of Sidley Austin LLP, and Lorie A. Chaiten, Harvey Grossman, Leah Bartelt and Krista Stone-Manista, all of Chicago, and Jennifer Dalven and Alexa Kolbi-Molinas, of New York, New York, for appellees.

Thomas Brejcha and Peter Breen, of Chicago, and Paul Benjamin Linton, of Northbrook, all of the Thomas More Society, for proposed intervenors Stewart Umholtz, State's Attorney of Tazewell County, and Edward Deters, State's Attorney of Effingham County, and for *amici curiae* Illinois State's Attorneys.

Mailee R. Smith, of Washington, D.C., for *amici curiae* Illinois Legislators.

Richard C. Baker, Amy J. Parrish and Noel W. Sterett, of Mauck & Baker, LLC, of Chicago, and Steven H. Aden, of Washington, D.C., for *amici curiae* Christian Medical and Dental Associations *et al.*

Alan S. Gilbert, Leah R. Bruno and Jillian Gutman Mann, of SNR Denton US LLP, of Chicago, for *amici curiae* Chicago Alliance Against Sexual Exploitation *et al.*

Justices

JUSTICE BURKE delivered the judgment of the court, with opinion.

Justices Freeman, Garman, and Theis concurred in the judgment and opinion.

Justice Thomas specially concurred, with opinion, joined by Chief Justice Kilbride and Justice Karmeier.

**OPINION**

¶ 1      On October 13, 2009, plaintiffs, The Hope Clinic for Women, Ltd., and Dr. Allison Cowett, filed suit in the circuit court of Cook County seeking to enjoin enforcement of the

Parental Notice of Abortion Act of 1995 (the Act) (750 ILCS 70/1 *et seq*. (West 2010)). Plaintiffs alleged that the Act is facially invalid, violating the privacy, due process, equal protection, and gender equality clauses of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §§ 2, 6, 12, 18). Defendants, Manuel Flores, in his capacity as Acting Secretary of the Illinois Department of Financial and Professional Regulation; Daniel Bluthardt, in his capacity as Director of the Division of Professional Regulation of the Illinois Department of Financial and Professional Regulation; and the Illinois State Medical Disciplinary Board, moved for judgment on the pleadings (735 ILCS 5/2-615(e) (West 2010)) or, in the alternative, dismissal of the complaint (735 ILCS 5/2-619(a)(4) (West 2010)). Stewart Umholtz, as State's Attorney of Tazewell County, and Edward Deters, as State's Attorney of Effingham County, petitioned the circuit court for leave to intervene in the matter. 735 ILCS 5/2-408(a)(2) (West 2010).

¶ 2         On March 29, 2010, after hearing argument, the circuit court upheld the facial validity of the Act, granted defendants' motion for judgment on the pleadings, and dismissed plaintiffs' complaint with prejudice. The circuit court then denied the proposed intervenors' petition as moot.

¶ 3         Plaintiffs and the proposed intervenors appealed the circuit court's orders. The appellate court reversed the dismissal of plaintiffs' complaint and remanded for further proceedings, but affirmed the order denying the proposed intervenors' petition to intervene. 2011 IL App (1st) 101463.

¶ 4         Petitions for leave to appeal were filed in this court by the proposed intervenors in No. 112673, and defendants in No. 112704. We granted the petitions and consolidated the appeals for review. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010).

¶ 5                                    BACKGROUND

¶ 6         Before addressing the issues raised in this appeal, it is important to set forth the long history of litigation associated with this case. The Illinois legislature enacted the Parental Notice of Abortion Act of 1995 (the Act) after it repealed the Parental Notice of Abortion Act of 1983 (the 1983 Act). See Ill. Rev. Stat. 1985, ch. 38, ¶ 81-61 *et seq*.; Pub. Act 83-890 (eff. Jan. 31, 1984). The 1983 Act became law on November 2, 1983, over the veto of then-Governor Thompson. The 1983 Act prohibited "unemancipated minors and incompetents" from obtaining an abortion unless both parents, or the legal guardian, were given notification. A putative class of physicians who provided or sought to provide abortions filed suit in the United States District Court for the Northern District of Illinois challenging the constitutionality of the 1983 Act under the federal constitution. See *Zbaraz v. Hartigan*, 584 F. Supp. 1452, 1454 (N.D. Ill. 1984) (*Zbaraz I*).

¶ 7         The federal district court, after reviewing relevant federal case law, held the 1983 Act to be constitutionally defective because: (1) it required a waiting period of at least 24 hours after notice was given to the minor's parents; (2) the judicial procedures for obtaining a waiver of the notification requirement, *i.e.*, the "judicial bypass" procedures, failed to provide for expeditious appellate review of notification decisions; and (3) the judicial bypass procedures did not assure the minor's or the incompetent's anonymity at either the trial or

-3-

appellate level. *Id.* at 1459, 1461-62.[1] Although the plaintiffs also had argued the unconstitutionality of other provisions within the Act, the court found these other provisions to be constitutionally sufficient. The court did, however, identify other problems with the statute which the plaintiffs had not raised. *Id.* at 1462-67.

¶ 8 Having ruled the Act unconstitutional, the district court permanently enjoined the defendants in that case—Neil Hartigan, in his official capacity as then-Attorney General of Illinois, and Richard M. Daley, in his official capacity as then-State's Attorney for Cook County and as representative of all State's Attorneys of all the counties of Illinois—from enforcing the provisions of the Act.

¶ 9 The district court's decision was affirmed in part and vacated in part by the Seventh Circuit Court of Appeals. See *Zbaraz v. Hartigan*, 763 F.2d 1532 (7th Cir. 1985) (*Zbaraz II*). The Seventh Circuit affirmed the district court's holding that the requirement of a 24-hour waiting period was unconstitutional, but found that portion of the Act to be severable. *Id.* at 1534. As to the "judicial bypass" procedures, however, the court vacated the district court's finding of unconstitutionality, but continued to enjoin enforcement of the statute "until the Illinois Supreme Court promulgates rules which assure the expeditious and confidential disposition of the waiver of notice proceedings at trial and on appeal." *Id.* at 1535, 1540-41. The court explained that, because time is of the essence in abortion decisions, the absence of rules providing for an expedited appeal was a fundamental defect requiring the statute to be enjoined. *Id.* at 1544 (relying on *American College of Obstetricians & Gynecologists, Pennsylvania Section v. Thornburgh*, 737 F.2d 283, 297 (3d Cir. 1984)). The cause was remanded to the district court "for a determination of the constitutionality of the waiver of notice proceedings when such rules are enacted." *Id.* at 1545.

¶ 10 The Seventh Circuit's opinion was affirmed by the United States Supreme Court, without opinion, "by an equally divided court." *Hartigan v. Zbaraz*, 484 U.S. 171, 172 (1987) (*per curiam*) (*Zbaraz III*).

¶ 11 Subsequently, then-Attorney General Neil Hartigan and then-State's Attorney Cecil Partee petitioned the federal district court to review the constitutionality of the 1983 Act in light of Illinois Supreme Court Rule 307(e), which had been promulgated by this court to provide for an expedited and confidential appeal of a waiver of notice decision. The district court found, however, that the bypass procedure, as set forth in Rule 307(e), was insufficient and did not cure the failure of the Parental Notice of Abortion Act of 1983 to provide a constitutional alternative to parental notification. The district court held that the safeguards for confidentiality and anonymity were insufficient to protect an unemancipated minor seeking to have an abortion throughout the waiver process, that is, from the moment a waiver petition is filed until the completion of any appeal. Accordingly, the court refused to lift the permanent injunction. See *Zbaraz v. Hartigan*, 776 F. Supp. 375 (N.D. Ill. 1991) (*Zbaraz*

---

[1]In striking down the judicial bypass procedures within the 1983 Act, the district court relied heavily on the United States Supreme Court decision in *Planned Parenthood Ass'n of Kansas City, Missouri, Inc. v. Ashcroft*, 462 U.S. 476 (1983), wherein the United States Supreme Court upheld a statute which required minors to secure parental or judicial consent before obtaining an abortion.

*IV*).

¶ 12    On June 1, 1995, the Illinois General Assembly repealed the 1983 Act and replaced it with the Parental Notice of Abortion Act of 1995. See 750 ILCS 70/1 *et seq.* (West 1996). The 1995 Act prohibits a physician from performing an abortion upon an unemancipated minor or "incompetent person" unless "48 hours actual notice" is given to "an adult family member." 750 ILCS 70/15 (West 1996). The Act provides for certain exceptions to the notice requirement when:

> "(1) the minor or incompetent person is accompanied by a person entitled to notice; or
>
> (2) notice is waived in writing by a person who is entitled to notice; or
>
> (3) the attending physician certifies in the patient's medical record that a medical emergency exists and there is insufficient time to provide the required notice; or
>
> (4) the minor declares in writing that she is a victim of sexual abuse, neglect, or physical abuse by an adult family member as defined in this Act. The attending physician must certify in the patient's medical record that he or she has received the written declaration of abuse or neglect. Any notification of public authorities of abuse that may be required under other laws of this State need not be made by the person performing the abortion until after the minor receives an abortion that otherwise complies with the requirements of this Act; or
>
> (5) notice is waived under Section 25 [procedure for judicial waiver of notice]." 750 ILCS 70/20 (West 1996).

¶ 13    The 1995 Act, like the 1983 Act, requested the Illinois Supreme Court "to promulgate any rules and regulations necessary to ensure that [judicial waiver] proceedings under this Act are handled in an expeditious and confidential manner." See 750 ILCS 70/25(g) (West 1996).

¶ 14    Six days later, on June 7, 1995, the plaintiffs amended their complaint in federal district court to challenge the constitutionality of the 1995 Act. On June 9, 1995, an "Agreed Preliminary Injunction" order was entered, which enjoined enforcement of the 1995 Act until the Illinois Supreme Court had the opportunity to promulgate rules for implementing the judicial bypass procedures, as requested in section 25(g) of the Act. See *Zbaraz v. Madigan*, No. 84 C 771, 2008 U.S. Dist. LEXIS 15559 (N.D. Ill. Feb. 28, 2008).

¶ 15    On December 22, 1995, the defendants in this new suit (then-Attorney General Ryan and then-Cook County State's Attorney O'Malley) notified the federal district court that the Illinois Supreme Court had declined to promulgate judicial bypass rules as requested by the legislature. Accordingly, on February 9, 1996, a permanent injunction order was entered, barring enforcement of the 1995 Act.

¶ 16    Ten years later, on September 20, 2006, this court adopted Illinois Supreme Court Rule 303A, entitled "Expedited and Confidential Proceedings Under the Parental Notification of Abortion Act." This rule provides: "Upon the filing of a petition in the circuit court for judicial waiver of notice under the Parental Notification of Abortion Act, the circuit court shall rule and issue written findings of fact and conclusions of law within 48 hours of the

time that the petition is filed \*\*\*." Ill. S. Ct. R. 303A(a) (eff. Sept. 20, 2006). The rule also provides for confidentiality throughout the proceedings,[2] the right to an expeditious appeal, and the appointment of counsel upon the request of the minor. Ill. S. Ct. R. 303A(b), (d), (f) (eff. Sept. 20, 2006).

¶ 17    Soon thereafter, Lisa Madigan, in her capacity as Attorney General of Illinois, and Anita Alvarez, in her capacity as State's Attorney of Cook County, filed a motion in the federal district court seeking to have the February 9, 1996, permanent injunction order dissolved. Plaintiffs objected, arguing that the new statute remained unconstitutional on its face.

¶ 18    On February 28, 2008, the federal district court denied the defendants' motion, declining to lift the injunction. See *Zbaraz v. Madigan*, 2008 U.S. Dist. LEXIS 15559. The court rejected all of the plaintiffs' allegations of unconstitutionality but one—the court found that the statute effectively denied abortions to "immature, best interest" minors because they, due to their immaturity, would be legally prohibited from consenting to an abortion and, thus, were left in "legal limbo."

¶ 19    The defendants filed an appeal from this decision in the Seventh Circuit Court of Appeals. On the same day that the defendants' appeal was filed, Stewart Umholtz, as State's Attorney of Tazewell County, and Edward Deters, as State's Attorney of Effingham County, filed a motion in the federal district court seeking to intervene in the case. They also asked the district court to reconsider its earlier ruling that the 1995 Act was unconstitutional. Both motions were denied and the proposed intervenors appealed to the Seventh Circuit. The Seventh Circuit consolidated this appeal with the one brought by the defendants.

¶ 20    On review, the Seventh Circuit reversed the district court's denial of the defendants' motion to dissolve the permanent injunction barring enforcement of the statute. *Zbaraz v. Madigan*, 572 F.3d 370 (7th Cir. 2009) (*Zbaraz V*). In its decision, filed on July 14, 2009, the court of appeals held that the Act, as supplemented by the judicial bypass procedures for obtaining a waiver of the parental notification requirement, was constitutional on its face. With regard to the proposed intervenors' appeal, the court affirmed the district court's denial of the motion to intervene, finding that the motion was untimely and, further, that the interests of the proposed intervenors were adequately represented by the defendants. *Id.* at 377-78.

¶ 21    Three months later, on October 13, 2009, The Hope Clinic for Women and Dr. Allison Cowett filed a complaint in the circuit court of Cook County against the Acting Secretary of

---

[2]The rule provides in section (f): "The petitioner shall be identified in the petition and any supporting memorandum in the method provided under Rule 660(c), as in appeals in cases arising under the Juvenile Court Act. Alternatively, the petitioner may use a pseudonym if she so requests. All documents relating to proceedings shall be impounded and sealed subject to review only by the minor, her attorney and guardian *ad litem*, the respective judges and their staffs charged with reviewing the case and the respective court clerks and their staffs." Ill. S. Ct. R. 303A(f) (eff. Sept. 20, 2006).

the Illinois Department of Financial and Professional Regulation (Manuel Flores[3]); the Director of the Division of Professional Regulation of the Illinois Department of Financial and Professional Regulation (Daniel Bluthardt); and the Illinois State Medical Disciplinary Board. Plaintiffs sought a declaratory judgment, a temporary restraining order, and preliminary and permanent injunctions against the enforcement of the Parental Notice of Abortion Act of 1995. Plaintiffs alleged that the Act is facially invalid because it violates the fundamental rights of minors who seek abortions to privacy (count I), due process (count II), equal protection (count III), and gender equality (count IV), as guaranteed by the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §§ 2, 6, 12, 18). Shortly after plaintiffs filed suit, Stewart Umholtz, as State's Attorney of Tazewell County, and Edward Deters, as State's Attorney of Effingham County, petitioned the circuit court for leave to intervene in the matter as of right, or by permission.

¶ 22    On November 4, 2009, the circuit court entered a temporary restraining order enjoining defendants from enforcing the Act. Thereafter, defendants, represented by Attorney General Lisa Madigan, filed a motion for judgment on the pleadings or, in the alternative, dismissal pursuant to sections 2-615(a) and (e), 2-619(a)(4), and 2-619.1 of the Code of Civil Procedure (735 ILCS 5/2-615(a), (e), 2-619(a)(4), 2-619.1 (West 2008)).

¶ 23    On March 29, 2010, in a memorandum opinion and order, the circuit court granted defendants' motion and dismissed plaintiffs' complaint with prejudice. The court held that plaintiffs were collaterally estopped from litigating their due process and equal protection claims by *Zbaraz V* because our state due process and equal protection clauses have been interpreted in limited lockstep with the nearly identical due process and equal protection clauses within the federal constitution. The circuit court also dismissed plaintiffs' privacy claim, finding that the burden which the Act places on a minor's right to an abortion would not be, in all circumstances, constitutionally unreasonable. Finally, the court dismissed plaintiffs' gender equality claim, finding that this provision of the Illinois Constitution is not implicated by the Act. In light of its decision to dismiss plaintiffs' complaint with prejudice, the circuit court denied the proposed intervenors' petition to intervene as moot.

¶ 24    Plaintiffs and the proposed intervenors appealed. The appellate court reversed the circuit court's dismissal of plaintiffs' complaint and remanded for further proceedings. 2011 IL App (1st) 101463. With respect to the proposed intervenors' appeal, however, the appellate court affirmed the circuit court's decision to deny the petition to intervene. *Id.* ¶ 133.

¶ 25    We granted petitions for leave to appeal brought by defendants and the proposed intervenors and consolidated them for our review. In addition, we allowed *amicus curiae* briefs in support of defendants to be filed by: (1) the Christian Medical and Dental Associations, the American Association of Pro Life Obstetricians and Gynecologists and the

---

[3]When this case was first filed, Brent Adams, in his capacity as the Acting Secretary of the Illinois Department of Financial and Professional Regulation, was named as a party defendant. By order dated February 8, 2013, plaintiffs' motion to substitute Manuel Flores, the new Acting Secretary of the Illinois Department of Financial and Professional Regulation, for the former Acting Secretary was granted.

Catholic Medical Association; (2) Illinois legislators, represented by Americans United for Life; and (3) Illinois State's Attorneys from 21 different counties (including Stewart Umholtz and Edward Deters), represented by the Thomas More Society.

¶ 26    We also allowed *amicus curiae* briefs in support of plaintiffs to be filed by*:* (1) the American College of Obstetricians and Gynecologists, the American Medical Women's Association, the American Psychiatric Association, the Illinois Academy of Family Physicians, the Illinois Chapter of the American Academy of Pediatrics, the Illinois Psychiatric Society, the Illinois Public Health Association, and the Society for Adolescent Health and Medicine; and (2) the Chicago Alliance Against Sexual Exploitation, the Chicago Coalition for the Homeless, the Healthy Teen Network, the Illinois Chapter of the National Association of Social Workers, the Illinois Coalition Against Sexual Assault, the National Association of Social Workers, the National Center for Youth Law, Sargent Shriver National Center on Poverty Law, the Teen Living Programs, UCAN, and the Women's Center, Inc.

¶ 27                                    ANALYSIS

¶ 28    In No. 112704, defendants, through their attorney, Lisa Madigan, Attorney General of Illinois, appeal the appellate court's reversal of the circuit court's finding that the Parental Notice of Abortion Act of 1995 is facially valid under the Illinois Constitution of 1970. In No. 112673, Stewart Umholtz, as State's Attorney of Tazewell County, and Edward Deters, as State's Attorney of Effingham County, appeal the appellate court's judgment affirming the circuit court's denial of their petition to intervene. We will address defendants' appeal first.

¶ 29                                 I. No. 112704

¶ 30                             A. *Standard of Review*

¶ 31    As noted above, plaintiffs' complaint challenges the constitutionality of the Parental Notice of Abortion Act of 1995, arguing that the Act is facially invalid under the due process, equal protection, privacy, and gender equality clauses of our state constitution.[4] Plaintiffs contended that, under our state constitution, minors, like adults, have a fundamental right to make reproductive decisions for themselves and that the Parental Notice of Abortion Act of 1995 places an unjustifiable burden on a minor's exercise of that fundamental right by preventing her from obtaining an abortion in Illinois unless a parent or guardian is first given notice of the minor's intention to have an abortion or the minor obtains a judicial waiver of the notice requirement. The circuit court found the Act to be constitutionally valid on its face, granted defendants' motion for judgment on the pleadings and dismissed plaintiffs' complaint with prejudice. The appellate court reversed the dismissal and remanded for trial.

¶ 32    What we consider in this appeal is the correctness of the circuit court's grant of judgment on the pleadings. Judgment on the pleadings is properly granted if the pleadings on file

---

[4]We note that plaintiff's challenge is necessarily a facial challenge because the Act, to date, has never been enforced.

disclose no genuine issues of material fact so that the movant is entitled to judgment as a matter of law. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455 (2010). Because the circuit court ruled as a matter of law, our review of its judgment is *de novo*. *Id.*

¶ 33　　We note, further, that when assessing the constitutional validity of a legislative act, we must begin with the presumption of its constitutionality. *Arangold Corp. v. Zehnder*, 187 Ill. 2d 341, 351 (1999). The burden of rebutting this presumption is on the party challenging the validity of the statute and any doubts must be resolved in favor of finding the law valid. *In re R.C.*, 195 Ill. 2d 291, 296 (2001); *People v. Inghram*, 118 Ill. 2d 140, 146 (1987). This burden is particularly heavy where, as here, a facial challenge is raised. A facial challenge to a legislative act is the most difficult challenge to mount successfully because the challenger must establish that under no circumstances would the challenged act be valid. *Davis v. Brown*, 221 Ill. 2d 435, 442 (2006). The fact that the statute might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid. *Id.* As we said in *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 473 (2009), "[f]acial invalidation is, manifestly, strong medicine that has been employed by the court sparingly and only as a last resort." (Internal quotation marks omitted.)

¶ 34　　　　　　　　B. *The Right to Abortion Under Our State Constitution*

¶ 35　　As a threshold matter, we observe that the parties to this appeal do not dispute that a right to abortion exists under our state constitution. They disagree, however, on the origin and scope of that right.

¶ 36　　Plaintiffs, relying on *Family Life League v. Department of Public Aid*, 112 Ill. 2d 449 (1986), maintain that the fundamental right to make reproductive decisions for one's self, which was first recognized under the federal constitution in *Roe v. Wade*, 410 U.S. 113 (1973), is a privacy right and that this right is secured for Illinois citizens, including minors, by our state constitution's privacy clause. Plaintiffs further maintain that because our state constitution contains an explicit right of privacy which the federal constitution does not have, the right to an abortion under our state constitution is broader than the right to an abortion under the federal constitution. For this reason, plaintiffs argue that the Illinois parental notification statute is unconstitutional as a matter of state constitutional law, regardless of what federal courts have said about such statutes as a matter of federal constitutional law.

¶ 37　　Defendants, on the other hand, argue that plaintiffs' reliance on *Family Life League* is misplaced. According to defendants, "Faithful application of the constitutional language, the records of the constitutional debates, and Illinois' history and experience shows that it is Illinois' due process clause, not its [privacy clause contained within the] search and seizure clause, that protects reproductive rights." Subsequent to *Roe*, the United States Supreme Court identified the federal right to abortion as a substantive due process right. See *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). Defendants contend that, because our due process clause is nearly identical to the due process clause in the federal constitution, and because we interpret cognate provisions of our state and federal constitutions in limited lockstep (see *People v. Caballes*, 221 Ill. 2d 282 (2006)), we should follow the United States Supreme Court and find that a right to abortion derives from our due

process clause. Additionally, defendants contend that there are no state grounds to depart from lockstep and, thus, the right to abortion under our state constitution is coextensive with the right to abortion under the federal constitution. Therefore, just as federal courts have upheld parental notification statutes under the federal constitution, this court should uphold the Illinois parental notification statute as a matter of state constitutional law.

¶ 38 Like defendants, we find plaintiffs' reliance on *Family Life League* for the proposition that a right to abortion in Illinois is guaranteed by our constitution's privacy clause to be problematic for a number of reasons. First and foremost, in *Family Life League* this court was never asked to decide whether a right to abortion exists under our state constitution. *Family Life League* was a *mandamus* action in which an anti-abortion group sought to force the Department of Public Aid to disclose, pursuant to the State Records Act (Ill. Rev. Stat. 1979, ch. 116, ¶ 43.4 *et seq.*), the names of providers who had furnished abortion services under the Illinois Medicaid program; the number of abortions they performed; and the amounts they were paid for such services. *Family Life League*, 112 Ill. 2d at 451-52. Arguing against disclosure, the Department contended that making the requested records available could indirectly infringe on the recipient's privacy rights. *Id.* at 454. The Department's theory was that divulging provider information might have an inhibiting effect on the number of providers willing to participate in the Medicaid abortion program and, as a result, "violate the holding in *Roe v. Wade*." *Id.* at 454.

¶ 39 This court rejected the Department's claim, but before doing so, made the following statement: "In *Roe v. Wade*, the Supreme Court first recognized a fundamental constitutional right of privacy which encompasses a woman's decision of whether to terminate her pregnancy. That right of privacy guaranteed by the penumbra of the Bill of Rights of the United States Constitution was also secured by the drafters of the 1970 Constitution of the State of Illinois. Ill. Const. 1970, art. I, secs. 6, 12." *Id.* at 454.

¶ 40 It is not clear from the opinion what prompted the court to make the above statement. However, we find it highly unlikely that the court intended, by this statement, not only to decide the rather weighty question of whether our state constitution guarantees the right to abortion, but also to conclude that such a right is guaranteed by our privacy clause, without providing any analysis to support such findings. In any event, to the extent that *Family Life League* might be interpreted as having made such findings, we find them to be *dicta*. As noted above, the Department's claims were based on the *federal* right to abortion and there was no need for the court to determine whether a state constitutional right existed.

¶ 41 There are additional reasons why we reject plaintiffs' contention that a right to abortion in Illinois is guaranteed by our state constitution's privacy clause. The privacy clause was added to article I, section 6, of the Illinois Constitution of 1970. That section, which is often referred to as the "search and seizure provision," provides as follows:

> "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, *invasions of privacy* or interceptions of communications by eavesdropping devices or other means." (Emphasis added.) Ill. Const. 1970, art. I, § 6.

¶ 42 The privacy clause is unique to the Illinois Constitution, there being no cognate provision

in the federal constitution. Accordingly, we interpret the provision without reference to a federal counterpart. See *Caballes*, 221 Ill. 2d at 289. Also, in *Caballes* we noted that "the protection against unreasonable invasions of privacy 'is stated broadly,' and '[n]o definition of types of privacy' intended to be protected 'is offered.' " *Id*. at 317 (quoting ILCS Ann., Ill. Const. 1970, art. I, § 6, Constitutional Commentary, at 522 (Smith-Hurd 1993)). Thus, in deciding the meaning of the privacy clause in our constitution, we look to the intent of the drafters.

¶ 43    Having reviewed the committee reports and transcripts of the debates at the constitutional convention, we find a variety of reasons were given for adding this privacy language. The delegates, themselves, struggled to define with precision the parameters of the right which they proposed to be added to article I, section 6. Mr. Gertz, chairman of the Bill of Rights Committee, stated the following:

> "We recognize in our report that in this kind of crowded, complicated world that there are necessarily a lot of invasions of privacy—that some of those invasions are reasonable. All we are saying, without spelling out in detail, is that a halt ought to be called somewhere to these invasions of privacy. The individual ought not to be completely at the mercy of the state. In every area we're trying to have the individual have a certain amount of dignity and have a certain amount of freedom from governmental interference of any kind." 3 Record of Proceedings, Sixth Illinois Constitutional Convention 1535 (hereinafter Proceedings).

¶ 44    Another delegate, Mrs. MacDonald, indicated that the additional language was necessary to address concerns that new, sophisticated technologies were being developed, or might be developed in the future, which the government could use to invade a citizen's privacy. 3 Proceedings 1534. Mr. Dvorak, who gave the opening presentation on article I, section 6, discussed the two proposed additions to the search and seizure clause—"invasion of privacy" and "interceptions of communications by eavesdropping devices." With regard to the invasion of privacy language, he said:

> "But there is the area of privacy still existing in very particular instances. For instance, we have now the concept of a general information bank whereby the state government or the federal government can take certain pertinent information about each and every one of us based on, for instance, our social security number—know our weight, height, family ages, various things about us—and this is not acceptable to—was not acceptable—or the theory or thought of such a thing—was not acceptable to the majority of our committee in approving section 6." 3 Proceedings 1525.

¶ 45    A comprehensive determination of all of the types of invasions of privacy the new clause was intended to protect against need not be made here because, whatever its purpose, it is clear that the privacy clause was not added to our constitution to address abortion rights. On this point the intent of the drafters was explicitly stated. At the Constitutional Convention, one of the delegates, Fr. Lawlor, posed a question to Mr. Gertz, chairman of the Bill of Rights Committee:

> "FATHER LAWLOR: Mr. Chairman—or rather Mr. Gertz—I would very much

appreciate it if you would assure the entire delegation here that the right of the people to be secure in their persons against unreasonable invasions of their privacy *** has absolutely nothing to do with the question of abortion.

MR. GERTZ: It certainly has nothing to do with the question of abortion." 3 Proceedings 1537.

¶ 46 In light of the above, we must conclude that any right to abortion in Illinois is clearly not grounded in the privacy clause of our state constitution. Therefore, we now consider whether, as defendants argue, a state constitutional right to abortion derives from our due process clause.

¶ 47 The due process clause of our state constitution is found in article I, section 2 (Ill. Const. 1970, art. I, § 2), and the language of our due process clause is nearly identical to its federal counterpart. As explained in *Caballes*, this court has adopted the "limited lockstep" approach for interpreting cognate provisions of our state and federal constitutions. Under this approach, when the language of the provisions within our state and federal constitutions is nearly identical, departure from the United States Supreme Court's construction of the provision will generally be warranted only if we find " 'in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned.' " *Caballes*, 221 Ill. 2d at 297 (quoting *People v. Tisler*, 103 Ill. 2d 226, 245 (1984)).

¶ 48 Applying the "limited lockstep" doctrine here, we first look to the United States Supreme Court's interpretation of the federal constitution's due process clause. In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 846 (1992), the Court held:

"Constitutional protection of the woman's decision to terminate her pregnancy derives from the Due Process Clause of the Fourteenth Amendment. It declares that no State shall 'deprive any person of life, liberty, or property, without due process of law.' The controlling word in the cases before us is 'liberty.' Although a literal reading of the Clause might suggest that it governs only the procedures by which a State may deprive persons of liberty, for at least 105 years, since *Mugler v. Kansas*, 123 U.S. 623, 660-661 (1887), the Clause has been understood to contain a substantive component as well, one 'barring certain government actions regardless of the fairness of the procedures used to implement them.' *Daniels v. Williams*, 474 U.S. 327, 331 (1986)."

¶ 49 The *Casey* Court went on to explain:

"The most familiar of the substantive liberties protected by the Fourteenth Amendment are those recognized by the Bill of Rights. We have held that the Due Process Clause of the Fourteenth Amendment incorporates most of the Bill of Rights against the States. See, *e.g.*, *Duncan v. Louisiana*, 391 U.S. 145, 147-148 (1968). It is tempting, as a means of curbing the discretion of federal judges, to suppose that liberty encompasses no more than those rights already guaranteed to the individual

-12-

against federal interference by the express provisions of the first eight Amendments to the Constitution. See *Adamson v. California*, 332 U.S. 46, 68-92 (1947) (Black, J., dissenting). But of course this Court has never accepted that view.

It is also tempting, for the same reason, to suppose that the Due Process Clause protects only those practices, defined at the most specific level, that were protected against government interference by other rules of law when the Fourteenth Amendment was ratified. See *Michael H. v. Gerald D.*, 491 U.S. 110, 127-128, n.6 (1989) (opinion of SCALIA, J.). But such a view would be inconsistent with our law. It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter. We have vindicated this principle before. Marriage is mentioned nowhere in the Bill of Rights and interracial marriage was illegal in most States in the 19th century, but the Court was no doubt correct in finding it to be an aspect of liberty protected against state interference by the substantive component of the Due Process Clause in *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (relying, in an opinion for eight Justices, on the Due Process Clause)." *Casey*, 505 U.S. at 847-48.

¶ 50    Given our adherence to "limited lockstep," we should interpret the due process clause of our state constitution the same way that the United State Supreme Court has interpreted the due process clause in the federal constitution unless there is something in the language of our constitution, or in the debates and the committee reports of the constitutional convention, which would indicate that the due process provision within our state constitution was intended to be construed differently.

¶ 51    Turning to that inquiry, we find that, at the Sixth Illinois Constitutional Convention, there was a great deal of discussion about the language of our state's due process clause. This discussion centered around a "majority" proposal to modify the clause by adding the words "including the unborn" so that our state due process clause would read, "No person, *including the unborn*, shall be deprived of life, liberty or property ***." (Emphasis added.) 3 Proceedings 1498-1523. From a reading of the debates, it is clear that the delegates were fully aware that this change in language would mean a deviation from the language of the federal due process clause. Mr. Wilson, a representative of the "minority" position, which opposed the addition of these three words, explained:

"Mr. President and fellow delegates, we are considering today a due process clause different than any other due process clause. It has no counterpart in the due process clause of any other state, and it is different than the due process clause in our Federal Constitution. Three words have been added to the due process clause which we are talking about. Those three words are 'including the unborn.' *** They are put in there by design—by intention—and there is a purpose and meaning to them. And I think, before we can intelligently decide the question before us, we have to know what these three words mean." 3 Proceedings 1504.

¶ 52    Mr. Wilson continued to elaborate on what he believed the purpose of the additional words to be:

"Now the three key words in the due process clause are 'life,' 'liberty,' and 'property.' ***

-13-

*** And obviously it is the intention of the new clause to refer to life. This, the minority believes, is plain and obviously an attempt to strengthen the due process clause which now protects all persons so as to make it perfectly clear under the due process clause that any liberalization of abortion—any liberal abortion law—would run into this further obstacle in the due process clause of the three words, 'including the unborn.'

***

Now, as Chairman Gertz said, we did have before us, prior to the time that this proposal was acted on, a proposal that spoke directly to the matter of abortion,[5] and it was defeated, although—as I recall—several committee members were absent at the time of that vote. I want to make clear the position of the minority. It is the position of the minority that the legislature should be left free to deal with the question of abortion *under the due process clause as it now stands*, and that no further impediments on the power of the legislature to act freely should be inserted in the due process clause in the form of these words. It is not the position of the minority that the constitution should speak to the question of abortion by putting into the constitution some provision that presumably would authorize or make more constitutional, if you please, the enactment of what I will refer to as liberalized abortion laws. It is our position that the constitution should not address itself to the question of abortion at all, *but that this should be left to be acted upon by the legislature under the existing language of the due process clause*." (Emphases added.) 3 Proceedings 1504.

¶ 53    Shortly thereafter, Mr. Wilson turned the floor over to Mr. Weisberg for further presentation on the subject. Mr. Weisberg continued to explain the minority position, stating:

"The minority has made the point that since there are deep religious differences in our society on this issue that we feel that views of any particular religious group or groups should not be written into the constitution on this subject. ***

* * *

*** There are serious problems here. It has been pointed out more and more frequently in recent years that there are serious medical and social problems which the Constitutional Convention, we submit, is not equipped to study and evaluate.

*** It seems clear that some legislatures which have moved to modify their law in this field have been responding to the judgment that enormous human suffering results from their laws in their present form.

---

[5]Certain delegates had previously suggested that the right to abortion be expressly protected by adding to the Bill of Rights the following language: "No penalty may be imposed by law upon any person in connection with an abortion performed by a licensed physician with the consent of the woman upon whom it is performed and, if she is an unmarried minor, the consent of her parents or guardian."

It has been observed—and I think we'll hear more about this in the debate—that the effect of the laws has not been really to eliminate the termination of pregnancies, but has been to drive them underground at enormous economic, social, and human cost \*\*\*. The discrimination against the poor and the deprived of our society that results is—has been amply documented." 3 Proceedings 1505.

¶ 54 Finally, in his closing remarks, Mr. Weisberg quoted the minority report's final paragraph:

" 'There are deep religious differences in our society on this issue. It would be wrong to write into the constitution the view of any religious group on the subject of abortion. In this area the law, especially the constitution, *should be neutral and should protect the rights of all persons to act in accordance with their own religious and moral convictions*.' " (Emphasis added.) 3 Proceedings 1506.

¶ 55 After considerable discussion, the majority proposal—to add the words "including the unborn"—failed. The minority position was adopted, overwhelmingly, by a vote of 80-32. Therefore, the end result of the debates at the Constitutional Convention was that our due process clause remained unchanged. That being so, there is nothing in those debates or committee reports which demonstrate " 'that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned.' " See *Caballes*, 221 Ill. 2d at 297 (quoting *People v. Tisler*, 103 Ill. 2d 226, 245 (1984)). Accordingly, we find no state grounds for deviating from the United States Supreme Court's interpretation that the federal due process clause protects a woman's right to an abortion. Therefore, at this time, we interpret our state due process clause to provide protections, with respect to abortion, equivalent to those provided by the federal due process clause.

¶ 56 C. *The Parental Notice of Abortion Act of 1995*

¶ 57 We must now determine whether the Parental Notice of Abortion Act of 1995 violates a woman's substantive due process right to an abortion. As noted above, plaintiffs contend that the Act violates the privacy, due process, equal protection, and gender equality clauses of our state constitution.

¶ 58 1. Count I: Right to Privacy

¶ 59 Plaintiffs alleged in count I of their complaint that the Parental Notice of Abortion Act of 1995 violates the privacy clause found in our state constitution in article I, section 6 (Ill. Const. 1970, art. I, § 6), by unreasonably intruding upon a minor woman's right to bodily autonomy and her right to make medical decisions about her reproductive health care. These assertions are based upon the premise that a woman's right to an abortion is protected by our constitution's privacy clause, and that our state constitution provides greater privacy protection than the federal constitution because our state constitution has an express privacy clause, which the federal constitution does not have. Plaintiffs also contended that the Act violates the privacy clause by interfering with a minor's right to keep her medical information confidential. Pointing out that, in *Kunkel v. Walton*, 179 Ill. 2d 519, 537-38

-15-

(1997), we said "confidentiality of personal medical information is, without question, at the core of what society regards as a fundamental component of individual privacy," plaintiffs argued that the Act unreasonably requires a pregnant minor to reveal information regarding some of the most intimate aspects of her life before she may exercise her right to have an abortion.

¶ 60    Although the circuit court accepted plaintiffs' premise that our constitution's privacy clause protects the right to an abortion, the court rejected plaintiffs' claim that the Act, on its face, violates the privacy clause of our state constitution. The court held that, since our constitution precludes only those invasions of privacy which are unreasonable, the Act does not violate the privacy clause because the disclosure of information necessary to obtain an abortion pursuant to the Act would not, in all instances, be unreasonable.

¶ 61    The appellate court reversed the circuit court. First, the appellate court noted that plaintiffs' privacy claim implicates two aspects of the Illinois privacy clause: the right to an abortion and the right against state-ordered disclosure of medical information. As to the right to an abortion, the appellate court agreed with the circuit court that, pursuant to *Family Life League*, our privacy clause protects the right to an abortion. However, the court rejected the circuit court's subsequent finding that the right to an abortion under our privacy clause is coextensive with the federal right. The appellate court also held that, pursuant to *People v. Caballes*, 221 Ill. 2d 282 (2006), our privacy clause must be interpreted separately and without reference to the federal constitution because it has no federal counterpart and, for that reason, remanded for further proceedings. 2011 IL App (1st) 101463, ¶ 96. In addition, the appellate court rejected the circuit court's alternative basis for dismissal—its reasonableness determination—finding it to be "unsupported." 2011 IL App (1st) 101463, ¶¶ 107-12.

¶ 62    As discussed earlier in this decision, we reject plaintiffs' premise that our constitution's privacy clause protects a woman's right to have an abortion. However, we agree with the appellate court that the other aspect of the privacy clause—the guarantee against state-ordered disclosure of medical information—is implicated by plaintiffs' privacy claim. In addition, we agree that our state constitution, by expressly guaranteeing a right of privacy, provides protections which are separate and distinct from those provided under the federal constitution. As we said in *In re May 1991 Will County Grand Jury*, 152 Ill. 2d 381, 391 (1992), "the Illinois Constitution goes beyond Federal constitutional guarantees by expressly recognizing a zone of personal privacy." However, we see no need to remand this matter to the circuit court. The issue here—whether the Parental Notice Act violates our constitution's privacy clause—is a legal question and, therefore, suitable for decision by this court.

¶ 63    The privacy clause of the Illinois Constitution forbids unreasonable invasions of privacy. Ill. Const. 1970, art. I, § 6; *Kunkel*, 179 Ill. 2d at 538. It is undoubtedly true, as plaintiffs contend, that the Act, by requiring minors who seek an abortion to give notice to an adult family member or obtain a judicial waiver of such notice, interferes with the minor's right to keep medical information confidential. However, we find, as did the circuit court below, that plaintiffs cannot show that the Act's intrusions on a minor's privacy are unreasonable—at least not in all cases, which is all that is necessary to defeat a facial challenge.

¶ 64 It was observed in *In re J.T.*, 221 Ill. 2d 338 (2006), that "[j]uveniles are a vulnerable population" and " '[o]ur history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults. Particularly "during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment" expected of adults.' " *In re J.T.*, 221 Ill. 2d at 380 (Freeman, J., dissenting) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115-16 (1982)). Thus, while a notice requirement similar to the one in the Act has been held unconstitutional when imposed on an adult (see *Casey*, 505 U.S. 833 (spousal notification statute unconstitutional under substantive due process)), it does not necessarily follow that it is unconstitutional to impose a notification requirement on minors, who, studies have shown, often lack the maturity and experience to make important decisions on their own. See *Roper v. Simmons*, 543 U.S. 551, 569 (2005) (noting that scientific and sociological studies tend to confirm a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults). Reasonableness is the touchstone of the privacy clause and we cannot say that treating minors differently than adults is unreasonable.

¶ 65 In *Kunkel v. Walton*, we recognized for the first time that our state constitutional privacy guarantee protects a person's reasonable expectation of privacy in his or her personal medical information. See *Kunkel*, 179 Ill. 2d at 537-38. However, we also recognized that "[t]he text of our constitution does not accord absolute protection against invasions of privacy. Rather, it is unreasonable invasions of privacy that are forbidden." (Emphasis omitted.) *Id*. at 538. We then held in *Kunkel* that section 2-1003(a) of the Code of Civil Procedure (735 ILCS 5/2-1003(a) (West 1994)), which required any party to a lawsuit who alleged a claim for bodily injury or disease to waive any privilege of confidentiality with his or her health care providers, violated our state constitution's privacy clause. We found the statute to be unreasonable because the waiver requirement was overly broad, requiring full disclosure of medical information that was not relevant to the issues in the lawsuit.

¶ 66 Similarly, in *In re Lakisha M.*, 227 Ill. 2d 259, 279 (2008), we held that where a privacy right under article I, section 6, is implicated, the critical question is whether the state's invasion of individual privacy is reasonable. Further, we held that "[r]easonableness, with regard to our state constitution's privacy clause, depends, largely, on the extent of one's expectation of privacy under the circumstances presented, as well as the degree of intrusiveness of the invasion of privacy." See also *People v. Caballes*, 221 Ill. 2d 282, 321, 327 (2006) (citing *People v. Cornelius*, 213 Ill. 2d 178, 193-94 (2004) (claims alleging a violation of our state privacy clause require a twofold inquiry: first, whether the party has a reasonable expectation of privacy in the information he seeks to protect and, second, whether the statute unreasonably invades that expectation of privacy)). In *Lakisha M.*, we determined that the extraction of DNA fell within the "zone of privacy" protected by our constitution's privacy clause. *Lakisha M.*, 227 Ill. 2d at 280. Nevertheless, we found the invasion of privacy to be minimal and upheld the constitutionality of the DNA indexing statute (730 ILCS 5/5-4-3 (West 2008)).

¶ 67 Applying the above standards here, we find that, while a minor clearly has an expectation of privacy in her medical information, which includes the fact of her pregnancy, the intrusion on the minor's privacy occasioned by the Act is not unreasonable. The state has an interest

-17-

in ensuring that a minor is sufficiently mature and well-informed to make the difficult decision whether to have an abortion. To advance that interest, it is reasonable for the state to encourage an unemancipated minor under the age of 18 who wishes to have an abortion to seek the support of a parent or other interested adult, or to require her to prove her maturity by obtaining a judicial waiver in a waiver process that is expedited and confidential. See 750 ILCS 70/25 (West 2010).[6] The Act is not unduly burdensome since it requires the minor to give notice to only one legally responsible adult (see 750 ILCS 70/10 (West 2010)) and provides for an exception to the notice requirement when a medical emergency exists and there is insufficient time to provide the required notice (see 750 ILCS 70/20 (West 2010)).

¶ 68    In light of the above, we agree with defendants that the Act is crafted narrowly to achieve its aim of promoting the minors' best interests through parental consultation. Accordingly, we find the Act is reasonable and, therefore, does not violate our state constitutional guarantee of privacy.

¶ 69    We reverse the judgment of the appellate court on count I and affirm the judgment of the circuit court.

¶ 70            2. Counts II and III: Due Process and Equal Protection

¶ 71    Plaintiffs alleged in count II that the Act violates substantive components of the Illinois Constitution's due process clause by unjustifiably impairing a minor woman's fundamental right to obtain an abortion. It does so, according to plaintiffs, "by unlawfully intruding upon a young woman's rights to bodily autonomy, to make decisions about her reproductive healthcare, and to keep medical information confidential." In count III, plaintiffs alleged that the Act violates equal protection "by discriminating against minors on the basis of their decision to exercise their fundamental right to abortion." Plaintiffs contended that there is no justification for requiring minors who choose abortion to notify a responsible adult, while placing no such requirement on minors who choose childbirth.

¶ 72    Our state constitution guarantees its citizens equal protection and due process of law in article I, section 2, which provides:

"No person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws." Ill. Const. 1970, art. I, § 2.

¶ 73    Our due process and equal protection clauses are nearly identical to their federal counterparts, found in the fourteenth amendment of the United States Constitution:

"[N]or shall any State deprive any person of life, liberty, or property, without due

_____

[6]Section 25 of the Act provides:

"Court proceedings under this Section shall be confidential and shall ensure the anonymity of the minor or incompetent person. All court proceedings under this Section shall be sealed. The minor or incompetent person shall have the right to file her petition in the circuit court using a pseudonym or using solely her initials. All documents related to this petition shall be confidential and shall not be made available to the public."

process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1.

¶ 74                    a. *Limited Lockstep and Collateral Estoppel*

¶ 75    In the circuit court, defendants initially countered plaintiffs' due process and equal protection claims by arguing that, because Illinois analyzes cognate provisions of our state and federal constitutions in "limited lockstep," plaintiffs' equal protection and due process claims were settled by the *Zbaraz V* decision and, thus, plaintiffs are collaterally estopped from relitigating those claims in state court. The circuit court adopted this reasoning and, without considering the merits of plaintiffs' due process and equal protection claims, held that it was constrained to find the Act constitutionally valid under the due process and equal protection clauses of our state constitution because "plaintiffs' equal protection and due process issues were sufficiently and finally decided by the federal litigation." The appellate court reversed, offering a number of reasons why it was error for the circuit court to have relied upon collateral estoppel to dismiss plaintiffs' due process and equal protection claims. 2011 IL App (1st) 101463, ¶¶ 68-79.

¶ 76    Before this court, defendants argue that the appellate court erred in reinstating plaintiffs' due process and equal protection claims. They contend that the appellate court "misapplied established collateral estoppel doctrine" and continue to maintain that collateral estoppel applies here to preclude plaintiffs' due process and equal protection claims. We disagree.

¶ 77    As the parties acknowledge, for collateral estoppel to apply: (l) the issue decided in the prior proceeding must be identical to the one in the current suit; (2) the prior adjudication must have been a final judgment on the merits; and (3) the party against whom the estoppel is asserted must have been a party to, or must be in privity with a party to, the prior adjudication. *In re A.W.*, 231 Ill. 2d 92, 99 (2008). Here there can be no collateral estoppel because the issues decided in the prior federal proceedings (*Zbaraz V*) are not identical to the issues presented in the current state suit. In *Zbaraz V*, the Seventh Circuit Court of Appeals considered whether the Illinois Parental Notice of Abortion Act violated the due process and equal protection clauses of the United States Constitution. In this suit, however, plaintiffs' complaint alleges that the Act violates the due process and equal protection clauses of our state constitution. While it is true that this court has typically construed our state due process and equal protection clauses as providing the same level of protection as provided by the nearly identical clauses within the federal constitution, we are not required to do so. See *People v. Caballes*, 221 Ill. 2d 282, 314 (2006) ("Th[e] limited lockstep approach is not a surrender of state sovereignty or an abandonment of the judicial function. *** [S]tate courts are free to independently construe their state constitutions to provide more protection than the federal constitution."); *People v. McCauley*, 163 Ill. 2d 414, 436 (1994) ("in the context of deciding State guarantees, Federal authorities are not precedentially controlling; they merely guide the interpretation of State law").

¶ 78    Moreover, *Zbaraz V* is a Seventh Circuit Court of Appeals decision and this court has consistently recognized that federal lower court decisions interpreting federal constitutional provisions—like the *Zbaraz V* decision here—are merely persuasive authority and are not

binding on our state courts. *People v. Kokoraleis*, 132 Ill. 2d 235, 293-94 (1989) ("Because lower Federal courts exercise no appellate jurisdiction over State courts, decisions of lower Federal courts are not conclusive on State courts ***."); *People v. Stansberry*, 47 Ill. 2d 541, 544-45 (1971).

¶ 79    Illinois courts, not federal courts, are the arbiters of state law. No federal court can interpret the meaning of our state constitutional provisions. The Illinois Constitution's guarantees of due process and equal protection (Ill. Const. 1970, art. I, § 2) stand separate and independent from the federal guarantees of those rights. *People v. McCauley*, 163 Ill. 2d 414 (1994); *People ex rel. Daley v. Joyce*, 126 Ill. 2d 209 (1988). Indeed, at various times this court has conducted an independent analysis of the Illinois Constitution and found that certain provisions offer our citizens greater protections than those enjoyed under the United States Constitution. *People v. Caballes*, 221 Ill. 2d 282 (2006); *People v. McCauley*, 163 Ill. 2d 414 (1994); *People v. DiGuida*, 152 Ill. 2d 104 (1992). While this court may, in construing the Illinois Constitution's guarantees of due process and equal protection, look for guidance and inspiration to constructions of their federal counterparts given by federal courts, the final decision on how the due process and equal protection guarantees of the Illinois Constitution should be construed is for this court to draw. *Rollins v. Ellwood*, 141 Ill. 2d 244, 275 (1990). Accordingly, we find that the circuit court erred in dismissing plaintiffs' due process and equal protection claims based on collateral estoppel.

¶ 80                                            b. *Merits*

¶ 81    Having determined that collateral estoppel does not apply, we address defendants' alternative argument, *i.e.*, that plaintiffs' due process and equal protection claims fail on their merits. Under substantive due process principles, a statute will be held unconstitutional if it impermissibly restricts a person's life, liberty or property interest. *People v. R.G.*, 131 Ill. 2d 328, 342 (1989). If the life, liberty or property interest is a fundamental right, then a statute limiting that right " 'may be justified only by a "compelling state interest," [citations] and *** must be narrowly drawn to express only the legitimate state interests at stake.' " *Id.* at 342 (quoting *Roe v. Wade*, 410 U.S. 113, 155 (1973)). Equal protection guarantees that similarly situated individuals will be treated similarly, unless the government demonstrates an appropriate reason to do otherwise. *City of Urbana v. Andrew N.B.*, 211 Ill. 2d 456, 466 (2004); *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). Equal protection prohibits the state from according unequal treatment to persons placed by a statute into different classes for reasons wholly unrelated to the purpose of the legislation. *People v. R.L.*, 158 Ill. 2d 432, 437 (1994); *People v. R.G.*, 131 Ill. 2d at 362. The standard for reviewing an equal protection claim is identical to that used for substantive due process, *i.e.*, if the statute infringes upon a fundamental right, then the statute must withstand strict scrutiny and will only survive if it is necessary to promote a compelling state interest and narrowly tailored to effectuate that state interest. *Id*. See also *In re D.W.*, 214 Ill. 2d 289 (2005); *People v. Cornelius*, 213 Ill. 2d 178, 204 (2004) (where the right alleged to be infringed is a fundamental constitutional right, the challenged statute, to comport with substantive due process and equal protection, must survive strict scrutiny analysis, that is, the means employed by the legislature must be necessary to achieve a compelling state interest, and the

statute must be narrowly tailored to accomplish this goal).

¶ 82    Plaintiffs argued in their complaint that the Act violates substantive due process and equal protection because it "unjustifiably places a restriction on a pregnant minor's fundamental right to have an abortion" and "singles out pregnant minors who choose abortion and imposes on them alone a requirement of parental notification as a condition of receiving medical care."

¶ 83    Once again relying on principles of lockstep, defendants contend that, because the due process and equal protection clauses of our state constitution are nearly identical to the due process and equal protection clauses of our federal constitution, our "limited lockstep" approach to interpreting cognate provisions of our state and federal constitutions requires us to interpret our state due process and equal protection clauses in a manner consistent with the United States Supreme Court's interpretation of the federal provisions unless there is some reason, such as the language of our constitution, the constitutional convention debates and committee reports, or state custom and practice, which indicate that the provisions of our constitution are intended to be construed differently. *Caballes*, 221 Ill. 2d at 310. In addition, defendants contend that there are no state grounds which would support a departure from federal precedent and, therefore, we should uphold the constitutionality of the Act based on the reasoning of the United States Supreme Court, which the *Zbaraz V* court relied upon when it upheld our Illinois parental notification statute against challenges brought pursuant to the due process and equal protection clauses of the federal constitution.

¶ 84    Plaintiffs agree that where, as here, cognate provisions of our state and federal constitutions are concerned, Illinois courts will generally follow federal precedent absent a reason to depart from federal law. However, plaintiffs contend that there is "ample reason" to depart from federal precedent here because "defendants simply cannot meet their burden of justifying interference with the fundamental right to abortion under [strict] scrutiny without an evidentiary hearing." Plaintiffs argue that we should affirm the appellate court's remand of this matter for trial and not simply rely on federal precedent because the federal cases "do not address many of the most problematic aspects of the Act, nor do they consider the scientific evidence that Plaintiffs have pled."

¶ 85    We disagree with plaintiffs and find remand unnecessary. Over the last four decades, the United States Supreme Court, as well as numerous other state and federal courts, have addressed challenges to the constitutionality of parental consent and parental notification statutes. During this time, all of the "problematic aspects" of parental notification statutes which plaintiffs raise before this court have been considered and rejected.

¶ 86    While it is unquestionably true that minors, like adults, possess constitutional rights, including the right to an abortion, the rights of minors are not coextensive with the rights of an adult. See *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52 (1976). Indeed, the very fact that we have a juvenile justice system is an acknowledgment that minors may constitutionally be treated differently than adults. See *Bellotti v. Baird*, 443 U.S. 622, 635 (1979) (plurality op.) (*Bellotti II*). This disparate treatment is "grounded in the recognition that, during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be

detrimental to them." *Id.* In addition, when considering the constitutionality of a parental notification statute, the minor's rights are not the only rights to be protected—parents have a constitutional right to raise their children and "the guiding role of parents in the upbringing of their children justifies limitations on the freedoms of minors." *Id.* at 637. In light of these competing interests, the United States Supreme Court has concluded that states may require a pregnant minor to notify her parents before obtaining an abortion as long as the state also provides an alternative procedure whereby authorization for the abortion can be obtained. *Id.* at 643.

¶ 87    The "alternative procedure" which saves a parental notification statute must meet four criteria. It must: "(i) allow the minor to bypass the consent [notice] requirement if she establishes that she is mature enough and well enough informed to make the abortion decision independently; (ii) allow the minor to bypass the consent [notice] requirement if she establishes that the abortion would be in her best interests; (iii) ensure the minor's anonymity; and (iv) provide for expeditious bypass procedures." See *Lambert v. Wicklund*, 520 U.S. 292, 295 (1997). A parental notification statute having a bypass procedure which satisfies these criteria does not unconstitutionally burden a minor's right to an abortion under the federal constitution. *Id.*

¶ 88    Challenges to the constitutionality of parental notification statutes brought on federal substantive due process grounds have been rejected based on the Supreme Court's finding that parental notification serves compelling state interests and, when containing a proper judicial bypass procedure, the statutes are narrowly tailored to serve those interests. See *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502 (1990) (holding that Ohio parental notice statute does not violate the fourteenth amendment); *H.L. v. Matheson*, 450 U.S. 398 (1981) (state notification statute plainly serves important state interests, is narrowly drawn to protect only those interests, and does not violate any guarantees of the Constitution, even though the statute allows a pregnant minor to consent to other medical procedures without formal notice to her parents if she carries the child to term); *Bellotti II*, 443 U.S. 622 (parental notice and consent are qualifications that typically may be imposed by the state on a minor's right to make important decisions because a state reasonably may determine that parental consultation often is desirable and in the best interest of the minor).

¶ 89    In *Hodgson v. Minnesota*, 497 U.S. 417 (1990), the Supreme Court invalidated a two-parent notification requirement in Minnesota's parental notification of abortion statute, but otherwise found the act to be constitutional. In so doing, the Court held:

>       "The State has a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely. See *Bellotti II*, 443 U.S., at 634-639 (opinion of Powell, J.); *Prince v. Massachusetts*, 321 U.S. 158, 166-167 (1944). That interest, which justifies state-imposed requirements that a minor obtain his or her parent's consent before undergoing an operation, marrying, or entering military service, [citations], extends also to the minor's decision to terminate her pregnancy. Although the Court has held that parents may not exercise 'an absolute, and possibly arbitrary, veto' over that decision, [citation], it has never challenged a State's reasonable judgment that the decision should be made after notification to and consultation with

a parent. See *Ohio v. Akron Center for Reproductive Health*, [497 U.S.] at 510-511; *Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 428, n.10, 439 (1983); *H.L. v. Matheson*, 450 U.S., at 409-410; *Bellotti II*, 443 U.S., at 640-641 (opinion of Powell, J.); *Danforth*, 428 U.S., at 75. As Justice Stewart, joined by Justice Powell, pointed out in his concurrence in *Danforth*:

> 'There can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of her parents in making the very important decision whether or not to bear a child.' *Id.*, at 91." *Hodgson*, 497 U.S. at 444-45.

¶ 90    The United States Supreme Court also has rejected claims, similar to those raised by plaintiffs here, that requiring parental notice for abortions, but not other types of medical care, violates equal protection. In *Bellotti II*, the Court explained that the abortion decision differs in important ways from other decisions that may be made during minority because the abortion decision has implications far broader than those associated with most other kinds of medical treatment. *Bellotti II*, 443 U.S. at 642, 649. Thus, the Court concluded that "a State reasonably may determine that parental consultation [regarding abortion] often is desirable and in the best interest of the minor" and, accordingly, may validly limit the freedom of children to choose for themselves in the making of such an important, affirmative choice with potentially serious consequences. See *Bellotti II*, 443 U.S. at 640, 648-49; *Matheson*, 450 U.S. at 412-13 ("If the pregnant girl elects to carry her child to term, the medical decisions to be made entail few—perhaps none—of the potentially grave emotional and psychological consequences of the decision to abort.").

¶ 91    We are persuaded by the reasoning contained in the Supreme Court cases which have found parental notification statutes constitutional under federal substantive due process and equal protection law. We conclude, therefore, that our Parental Notice Act furthers a "constitutionally permissible end" by encouraging an unmarried, pregnant minor to seek the help and advice of a parent or other adult family member in making the very important decision whether or not to bear a child. See *Danforth*, 428 U.S. at 91. Moreover, we agree that the decision to undergo the surgical procedure of an abortion is sufficiently distinguishable from other medical care decisions and, thus, provides a basis for treating pregnant minors who choose abortion differently than those who choose to continue their pregnancy. As noted above, equal protection requires that "all persons similarly circumstanced *** be treated alike." *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). It does not, however, "require things which are different in fact or opinion to be treated in law as though they were the same." (Internal quotation marks omitted.) *Plyler v. Doe*, 457 U.S. 202, 216 (1982).

¶ 92    Finally, we find no state grounds for disregarding federal precedent when interpreting our state constitution's due process and equal protection clauses. Since both our state constitution and the federal constitution use similar language in setting forth the due process and equal protection guarantees, a departure from the United States Supreme Court's interpretation of the federal clauses is warranted only if there is good cause for doing so. In other words, we must be able to point to something in the constitutional debates and records, or our state history or custom, which would suggest that a different meaning should attach to our due

process and equal protection clauses.

¶ 93 Plaintiffs have offered no state-based rationale for interpreting our clauses differently than the United States Supreme Court interprets the federal clauses. Instead, plaintiffs simply seek to have us affirm the appellate court's remand to afford plaintiffs the opportunity to show that the Supreme Court decisions relied upon by defendants are premised on "outdated assumptions and prejudices about abortion."

¶ 94 We are unpersuaded by plaintiffs' arguments. Finding no reason to depart from lockstep here, we adopt the reasoning of the United States Supreme Court in holding that the Illinois Parental Notice of Abortion Act of 1995 does not violate our state constitutional guarantees of due process and equal protection. Accordingly, we reverse the judgment of the appellate court on counts II and III and affirm the judgment of the circuit court.

¶ 95                              D. *Count IV: Gender Equality*

¶ 96 The Illinois Constitution provides in article I, section 18:

> "The equal protection of the laws shall not be denied or abridged on account of sex by the State or its units of local government and school districts."

¶ 97 Plaintiffs asserted in count IV of their complaint that the Act violates this clause "by preferencing childbirth over abortion, thus improperly advancing gender stereotypes about the role of women as mothers." The circuit court rejected this assertion, finding that there was nothing in either the language or history of the Act which would lead it to conclude that the purpose of the Act was to maintain the life of the fetus or to impose on minors stereotypical views about womanhood.

¶ 98 The appellate court reversed the judgment of the circuit court and remanded for further proceedings. Relying on this court's decision in *People v. Ellis*, 57 Ill. 2d 127, 130 (1974), Justice Gordon, in the lead opinion, found that the purpose of the gender equality clause is "to guarantee rights for females equal to those of males." 2011 IL App (1st) 101463, ¶ 115. He then went on to hold:

> "In the case at bar, the law discriminates between men and women by permitting a minor male, without notifying his parents, to consent or withhold consent for a surgical procedure for his child, even if that decision might endanger the health or life of that child, while requiring parental notice for a minor woman seeking to abort. Compare Consent by Minors to Medical Procedures Act (410 ILCS 210/1 (West 2008) (minor father 'is deemed to have the same legal capacity to act' as an adult)) with Parental Notice of Abortion Act (750 ILCS 70/15 (West 2008)). If a minor male can make a life-endangering decision for his child, then certainly a minor female should be able to make a similar decision for a fetus. If the male's decision does not require parental notification, then requiring parental notification for only the female's decision creates a gender-based distinction." *Id.* ¶ 118.

¶ 99 Finding that strict scrutiny applied to this claim, Justice Gordon remanded to the circuit court "to provide the State an opportunity to satisfy its burden under strict scrutiny review of demonstrating a compelling state purpose." *Id.* ¶ 114.

¶ 100　　In a special concurrence, Presiding Justice Garcia stated, "I do not join in the author's suggestion that *** the Act '[improperly] discriminates between men and women.' " 2011 IL App (1st) 101463, ¶ 138 (Garcia, P.J., specially concurring). Nevertheless, Justice Garcia joined in the decision to reverse and remand.[7] Justice McBride, however, dissented in part, stating: "I do not believe the allegations accepted as true and authority relied upon by plaintiffs support the contention that the Act violates article I, section 18, of the Illinois Constitution. Accordingly, I would affirm the trial court's dismissal of count IV." 2011 IL App (1st) 101463, ¶ 136 (McBride, J., concurring in part and dissenting in part).

¶ 101　　Before this court, plaintiffs urge us to affirm the appellate court's reversal of the circuit court's dismissal of their gender equality claim. However, plaintiffs do not adopt Justice Gordon's reasoning. Instead, they argue, as they did in the circuit court, that the Act "furthers discriminatory, gender-based stereotypes by permitting teens who conform to the view that women must put childbearing and motherhood above all else to make their own decisions about continuing their pregnancies and to consent to all medical care without state-mandated parental or court involvement, while erecting dangerous barriers for those who, by seeking an abortion, challenge this version of a woman's role." Plaintiffs contend further that because the Act creates a gender-based classification (as described above), the appellate court was correct to remand to the circuit court for consideration of whether the Act can survive strict scrutiny.

¶ 102　　Article I, section 18, of the Illinois Constitution of 1970 was first interpreted and applied by this court in *People v. Ellis*, 57 Ill. 2d 127 (1974). At issue in *Ellis* was the constitutionality of a provision of the Juvenile Court Act which provided that, in order to be prosecuted under the criminal laws of the state, a boy had to be 17 years old, but that a girl had to be 18 years old. We first determined that a sex-based classification was a "suspect classification" which had to withstand strict scrutiny to be valid. We then invalidated the provision of the Juvenile Court Act, finding that it created a sex-based classification and there were no compelling reasons for the disparate treatment. *Ellis*, 57 Ill. 2d at 132-33; see also *Phelps v. Bing*, 58 Ill. 2d 32, 35 (1974) (no compelling state interest which justifies treating males and females of the same age differently for the purpose of determining their rights to a marriage license).

¶ 103　　In their brief, plaintiffs cite our decision in *In re Estate of Hicks*, 174 Ill. 2d 433 (1996). However, we do not find that it advances their position. In *Hicks*, we considered the constitutionality of section 2-2(d) of the Probate Act of 1975 (755 ILCS 5/2-2(d) (West 1994)), which permitted only mothers, and not fathers, to inherit by intestate succession from their illegitimate children. We found that statute created a sex-based classification because it distinguished between the parents of an illegitimate child based solely upon the gender of the parent.

---

[7]It is not clear what Justice Garcia intended when he stated that he disagreed with "the author's suggestion that *** the Act '[improperly] discriminates between men and women.' " However, we follow the judgment line. Accordingly, we interpret Justice Garcia's separate opinion as a concurrence, resulting in a judgment of two to remand count IV.

¶ 104	In contrast to *Hicks*, in *People v. Adams*, 149 Ill. 2d 331 (1992), we rejected an argument that section 5-5-3(g) of the Unified Code of Corrections (730 ILCS 5/5-5-3(g) (West 1992)), which required, among other things, that persons who were convicted of the offense of prostitution be tested for HIV, violated the gender equality clause of the Illinois Constitution. We said:

> "[W]e reject the alternative contention, made by the defendants and certain *amici*, that the statute creates a sex-based classification because of its *impact* on female offenders, and that it must therefore survive strict scrutiny under the Illinois Constitution's prohibition of sex-based discrimination (Ill. Const. 1970, art. I, § 18; see *People v. Ellis* (1974), 57 Ill. 2d 127, 132-33). The statute draws no distinction between male and female offenders, and the defendants point to no evidence of an intent by the legislature to disadvantage female offenders. Accordingly, the additional claim of disparate impact must be rejected." (Emphasis added.) *Adams*, 149 Ill. 2d at 352.

¶ 105	In the case at bar, we fail to see how the Act creates a sex-based classification or how the alleged discrimination against pregnant minors who choose an abortion is in any way related to their gender. Like the circuit court, we reject plaintiffs' assertions that the Act "furthers discriminatory, gender-based stereotypes." We find no evidence that the Act's purpose is to deny pregnant minors their right to an abortion or to advance a preference for childbirth. Furthermore, since we have already held that the Act does not violate equal protection, we do not agree with plaintiffs that the Act discriminates against minor females who choose to have an abortion. But even if we had agreed with plaintiffs' premise, we would be compelled to find no gender equality violation. The discrimination which is alleged is between different classes of persons of the same gender. The gender equality clause of our constitution has never been interpreted so broadly so as to apply in such situations.

¶ 106	For all of the reasons stated above, we find that the Act does not violate the gender equality clause of our Illinois Constitution. Accordingly, we reverse the judgment of the appellate court on count IV and affirm the judgment of the circuit court.

¶ 107	II. No. 112673

¶ 108	As noted above, shortly after plaintiffs filed suit against defendants in the circuit court (No. 09 CH 38661), Stewart Umholtz, State's Attorney of Tazewell County, and Edward Deters, State's Attorney of Effingham County (the proposed intervenors), petitioned the circuit court for leave to intervene in the matter as of right, or by permission. The circuit court, after dismissing plaintiffs' complaint with prejudice, denied the proposed intervenors' petition as moot.

¶ 109	The proposed intervenors appealed. On appeal, the appellate court reversed the circuit court's dismissal of plaintiffs' complaint, but affirmed the circuit court's denial of the petition to intervene. The appellate court held:

> "Since the proposed intervenors failed to demonstrate either inadequate representation by the state's Attorney General or an interest separate and apart from either the general public or the existing parties, we find that the trial court did not

abuse its discretion in denying their motion to intervene." 2011 IL App (1st) 101463, ¶ 131.

¶ 110    The proposed intervenors then filed a petition for leave to appeal in this court, which we allowed. However, we now find that we need not address the proposed intervenors' appeal. Because we have found that the Act does not violate our state constitutional guarantees of due process, equal protection, privacy or gender equality, plaintiffs' complaint was properly dismissed with prejudice and there is no case in which to intervene. Thus, the circuit court properly dismissed the proposed intervenors' petition as moot.

¶ 111                                                CONCLUSION

¶ 112    We reverse that part of the appellate court's judgment which reversed the circuit court's dismissal of plaintiffs' complaint and remanded for further proceedings, but affirm that part of the judgment which affirmed the circuit court's denial of the petition to intervene. The judgment of the circuit court, which dismissed the complaint and denied the petition to intervene, is affirmed.

¶ 113    Appellate court judgment affirmed in part and reversed in part.

¶ 114    Circuit court judgment affirmed.

¶ 115    JUSTICE THOMAS, specially concurring:

¶ 116    I concur in the judgment of Justice Burke's lead opinion holding that the Parental Notice of Abortion Act of 1995 is not unconstitutional on its face and that all of plaintiffs' challenges to the Act should be rejected. I write separately, however, to express my disagreement with the lead opinion's conclusion that the due process clause of the Illinois Constitution contains a right to abortion that is coextensive with the right to abortion in the federal constitution. I believe that the framers of our state constitution in 1970 specifically chose not to create a right to abortion at all in our state constitution, but rather wanted to leave the question of abortion regulation to the state legislature. Thus, I disagree with the portion of the lead opinion that holds that there is a right to abortion under the Illinois due process clause.

¶ 117    The due process clause in the Illinois Constitution of 1970 is found in article I, section 2, and provides as follows:

    "No person shall be deprived of life, liberty or property without due process of law ***." Ill. Const. 1970, art. I, § 2.

This due process language is the same as article II, section 2, of the 1870 Illinois Constitution. Additionally, the language of the clause basically tracks the fourteenth amendment of the United States Constitution.

¶ 118    Generally, provisions in the Illinois Constitution that are similar in language to those in the federal constitution will be similarly construed, unless we "find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which *** indicate[s] that the provisions of our constitution are intended to be

-27-

construed differently than are similar provisions in the Federal Constitution, after which they are patterned." *People v. Caballes*, 221 Ill. 2d 282, 297, 310 (2006) (quoting *People v. Tisler*, 103 Ill. 2d 226, 245 (1984)). This is the limited lockstep approach.[8] "[O]ur choice of a rule of decision on matters governed by both the state and federal constitutions has always been and must continue to be predicated on our best assessment of the intent of the drafters, the delegates, and the voters—this is our solemn obligation." *Caballes*, 221 Ill. 2d at 313.

¶ 119    A perusal of the debates and committee reports of the constitutional convention leads inexorably to the conclusion that the framers of the Illinois Constitution of 1970 did *not* intend to incorporate a right to abortion in the due process clause of article I, section 2, or anywhere else in the Illinois Constitution. Thus, I too reject plaintiffs' suggestion that our state constitution extends guarantees that are *more* protective of abortion than the federal due process clause. But I would do so for the reason that the drafters did not intend to place a right to abortion at all in our state constitution.

¶ 120    In the spring of 1970, the Bill of Rights Committee of the Sixth Constitutional Convention voted 9 to 6 to add the phrase "including the unborn" after the word "person" to the existing due process clause contained in the Bill of Rights of the Illinois Constitution of 1870. 6 Proceedings 18. These three words were added "to assure that an unborn person cannot be deprived of life, liberty or property by the State without due process of law." *Id.* at 19. A minority of the committee opposed this language. Their reasons for doing so are determinative as to whether the drafters intended to embrace a right of abortion in the language that was ultimately adopted.

¶ 121    The minority's position, placed in a "Minority Report," stated in relevant part as follows:

"It is our position that the chief, if indeed not the only, effect of these words is to prohibit the General Assembly from enacting any laws to permit abortions, except presumably abortions which are now permitted under Illinois law where necessary to preserve the life of the mother. It seems clear that this has to be the effect if the words in question are to be given any significance whatsoever.

\*\*\*

It is the minority's position that *the subject of abortion law should be left to the legislature*, which can study and evaluate the pertinent medical and social facts and policy consideration.

\* \* \*

*The subject of abortion law should be left to the legislature.* This Constitutional Convention is not equipped to study the pertinent medical or social facts or weigh the competing policy considerations which bear on the question of what kind of abortion law Illinois should have.

It is the further position of the minority that if the Convention should decide that the subject of abortion ought to be dealt with in the Constitution, this should be

---

[8]This approach has been modified to include "consideration of state tradition and values as reflected by long-standing state case precedent." *Caballes*, 221 Ill. 2d at 314.

accomplished by means of a separate section dealing directly and explicitly with the subject." (Emphases added.) *Id.* at 130-35.

¶ 122    The issue then went to the convention floor for the full delegation to consider the question of whether the language "including the unborn" should be retained or deleted. Delegate Arthur Lennon began by presenting the majority position that the additional language should be retained. 3 Proceedings 1496-1501. He asserted that "due process only has application to actions *by the state* in relationship to individuals." (Emphasis added.) *Id.* at 1496. Thus, it was his view that the majority's version did not apply to private conduct, but only to state action such as a compulsory abortion law, where, for example, the legislature might order that all pregnant women have an abortion. *Id.* at 1502. He stated that the addition of the words was "intended to limit the state from compelling the taking of a human life," but did not otherwise apply to prevent a women from having an abortion. Instead, the criminal sanctions, if any, set by the legislature would govern that situation. He also discussed Illinois case law at length and asserted that the trend was to find an unborn child to be a "person" for many purposes under the law—such as inheritance, tort and criminal law—and he inferred that Illinois courts would likely hold that the word "person" in the Illinois due process clause would include an unborn child even in the absence of "including the unborn" language. *Id.* at 1497-99.

¶ 123    Delegates Lewis Wilson and Bernard Weisberg, who were both members of the Bill of Rights Committee and two of the five signers of the minority proposal to remove the words "including the unborn," then presented the minority position. Delegate Wilson began by emphasizing that the purpose of the addition of the three words was to prohibit the General Assembly from allowing some or all abortions:

> "This, the minority believes, is plain and obviously an attempt to strengthen the due process clause which now protects all persons so as to make it perfectly clear under the due process clause that any liberalization of abortion—any liberal abortion law—would run into this further obstacle in the due process clause of the three words, 'including the unborn.' " *Id.* at 1504.

He then left no doubt regarding the legislature's continuing authority to prohibit and/or regulate abortion under the minority proposal:

> "I want to make clear the position of the minority. It is the position of the minority that the legislature should be left free to deal with the question of abortion under the due process clause as it now stands, and that no further impediments on the power of the legislature to act freely should be inserted in the due process clause in the form of these words. *It is not the position of the minority that the constitution should speak to the question of abortion by putting into the constitution some provision that presumably would authorize or make more constitutional, if you please, the enactment of what I will refer to as liberalized abortion laws. It is our position that the constitution should not address itself to the question of abortion at all, but that this should be left to be acted upon by the legislature under the existing language of the due process clause.*
>       ***

*** The legislature, I think, has shown the capacity and the will to act in the field of abortion law; and *we feel perfectly confident in leaving this to the legislature and not trying to constitutionalize it*. There are too many imponderables. The whole subject is too dynamic and too volatile. This is not like freedom of speech or freedom of worship. We will never want the legislature to have the right there to do away with freedom of worship or freedom of speech or those kinds of rights, but this is a different sort of subject. It is volatile; it's dynamic; the world is changing; and we feel that this should be left to the legislature." (Emphases added.) *Id.* at 1504-05.

¶ 124    Parenthetically, I note that three different attempts were made in February 1970 to have the Bill of Rights of the 1970 Constitution specifically include the right to abortion in one form or another. All three attempts were defeated. In that regard, Member Proposal No. 387 would have provided that "[t]he State shall make no law decreeing who is to be born or who is to die." 7 Proceedings 3012. Member Proposal No. 407 would have provided that "[n]o penalty may be imposed by law upon any person in connection with an abortion performed by a licensed physician with the consent of the woman upon whom it is performed and, if she is an unmarried minor, the consent of her parents or guardian." *Id.* at 1321. And finally, Member Proposal No. 506 would have provided that "any female by giving her consent and approval shall not be denied the right to comply with advice given by qualified medical authorities." *Id.* at 3069. Again, all three of these proposals that would have constitutionalized the right to abortion were defeated.

¶ 125    Returning to the presentations on the floor with respect to the minority proposal, I note that Delegate Weisberg echoed the intent expressed by Delegate Wilson:

"The minority believes that, as Lew Wilson has pointed out, that *this subject is peculiarly appropriate and necessary to leave to the legislature.* There are serious problems here. It has been pointed out more and more frequently in recent years that there are serious medical and social problems which the Constitutional Convention, we submit, is not equipped to study and evaluate." (Emphasis added.) 3 Proceedings 1505.

Delegate Weisberg concluded his remarks by reading from the minority report to emphasize that he believed the addition recommended by the majority "would create a divisive and emotional issue in the referendum campaign" for voter approval. *Id.* at 1506.

¶ 126    Following questioning of the presenters of the minority position, the floor was then opened for debate. Delegates from both sides of the issue rose to speak—and opinions were expressed both for and against constitutionalizing due process protection for an "unborn person." *Id.* at 1509-21. Some expressed the belief that the word person in the existing Illinois constitution already protected the "unborn." *Id.* at 1521-22 (see comments of Mrs. Kinney and Mr. Ladd).[9] Others expressed the view that the specific reference to the unborn

---

[9]Mrs. Kinney explained her "yes" vote to delete the "including the unborn" language by stating, that, "If we speak of an unborn person, haven't we said it all when we simply say 'person'?" She also stated that she wished to set the record straight that by voting to delete the language, she did not believe that she or the delegation was voting in favor of legalized abortion. *Id.* at 1521.

was necessary to combat the "reprehensible" theory that some witnesses presented to the committee that advocated abortion as a form of population control for an overcrowded state. See *id.* at 1512-13.

¶ 127    Delegate Albert Raby, also a member of the Bill of Rights Committee and a signer of the minority report, rose to explain his position and to explain that the constitutional convention was not "in the mood" to in any way tie the hands of the legislative branch or prevent it from acting with respect to abortion:

> "I'd like the record to show that if I had my way in this Convention we would write a constitutional provision which would establish—which would prevent the legislature from writing any laws that dealt with the question of whether a woman could or could not have a child. It was very early in the game that I recognized that our committee—and I came to grips with the fact that the Convention was not in a mood to do that. ***

> * * *

> While I would hope that this Convention would have faced this issue squarely—would have included in the constitution a prevention from the legislature acting on this matter—I am—I recognize that that is not possible, and I support the *** minority—report and strongly suggest that it ought to be supported ***." *Id.* at 1514.

¶ 128    Delegate Cliff Kelley, the drafter of Member Proposal No. 407 that would have placed the right of abortion in the Bill of Rights of our 1970 constitution, also urged that the matter be left to the legislature:

> "On February 26 of this year I offered to the Convention Member Proposal No. 407, which ***

> > Proposes that the legislature be precluded from imposing any penalty in connection with an abortion performed by a licensed physician with the consent of the woman upon whom it is performed ***.

> Whereas this proposal reflects my philosophy in regard to abortion, I am not at this time suggesting that we adopt such. I am suggesting that we not preclude the

---

There is certainly support for the view that many delegates believed that the word "person" in the existing Illinois due process clause of 1870 would be or had already been interpreted to include an unborn child from the time of his or her conception. Delegate Wilson, a presenter of the minority report, told the delegation during the debate that it was their position "that the unborn person is now protected as are other persons by the due process clause as it's been written and as it's stood for 100 years or so, and that nothing further is needed as far as the due process clause is concerned." *Id*. at 1507-08. This was indeed the view taken with respect to the federal due process clause in *Steinberg v. Brown*, 321 F. Supp. 741, 746-47 (N.D. Ohio 1970), where the court held that "[o]nce human life has commenced [at conception], the constitutional protections found in the Fifth and Fourteenth Amendments impose upon the state the duty of safeguarding it."

At any rate, whether the word "person" in the Illinois due process clause includes an unborn child is a separate question, and we do not address it here.

General Assembly from enacting such legislation in the future. Of course, it has been suggested to me by many people that the General Assembly *** in its conservatism will never adopt such legislation anyway, but that remains to be seen." *Id.* at 1516.

¶ 129 Delegate Elward, a supporter of the majority position, also addressed the convention. He offered some prescient remarks that in some respects foresaw the present litigation:

"It is said in some circles we should leave this to the General Assembly, but those people who this afternoon tell you to leave it to the General Assembly will tomorrow morning file the lawsuit that says the General Assembly should have no power to deal with this question. They seek by court action to overturn what the General Assembly has or has not done. *** They don't trust this Convention; they don't trust the General Assembly ***." *Id.* at 1517.

¶ 130 After all the delegates were heard that wished to speak in the debate, a roll call was called by the clerk. It was explained that those who wanted to strike the words "including the unborn" would vote aye or yes. And those who wanted to preserve those words would vote nay or no. The vote tally was 80 ayes to 32 nays, and the "including the unborn" language was deleted.

¶ 131 A number of delegates spoke to the convention to explain their vote. It seems that a great number of delegates voted "yes" to defeat the inclusion of the "unborn" language, even though they were "sympathetic" to the majority report or were in favor of strict abortion laws. The remarks of Delegate MacDonald seem representative of many, when she said that she voted yes because she believed the convention was leaving abortion-related issues "to the legislature and not to this constitution." See, *e.g.*, *id.* at 1522.

¶ 132 I would submit that we can easily conclude from the drafter's rejection of the "including the unborn" language that the drafters did not want to tie the hands of the legislative branch from enacting laws that would *allow* some or all abortions. Similarly, we can conclude from the drafter's rejection of the proposals to specifically include the right to abortion in the constitution that the drafters did not want to tie the hands of the legislative branch from enacting laws that would *prohibit* some or all abortions. The rejection of these competing proposals itself indicates that the constitutional delegates wanted to leave the regulation of abortion to the legislature.

¶ 133 This intent of our drafters is clearly different from the holding 22 years later in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), which located a right to abortion in the federal due process clause and which reaffirmed the central tenet of *Roe v. Wade*, 410 U.S. 113 (1973), that a woman has a right to abortion under the federal constitution before viability "without undue interference from the State." So the reality here is that the intent of our drafters was contrary to *Casey*. I would not apply lockstep here, where following Supreme Court precedent as to the federal provision would lead to a result that is different from what the framers intended our own state constitution's cognate provision to mean. The drafters specifically refused to modify our state constitution to limit the legislature's authority to restrict abortion or prohibit it outright. Instead they expressed a strong intent to leave the matter of abortion regulation to our state legislature.

¶ 134 The situation here in applying the *Caballes* limited lockstep approach is a unique one.

By the time of the constitutional convention's debate in 1970, what the delegates called "liberalized abortion laws"—that is, laws that would legalize abortion well beyond the traditional limit of only when necessary to save the life of the mother—were being proposed in some quarters. The Supreme Court of the United States, of course, had not yet ruled that there was a right to abortion under the federal constitution; that would not come for three more years with the Court's ruling in *Roe*. Thus, the drafters were working with a blank slate and yet were well aware of their options with respect to the question of abortion. They fully considered the question and made their intent clear. They wanted to leave the area of abortion regulation in Illinois to the General Assembly. They specifically did not want to memorialize in the Illinois Constitution either a right to an abortion on the one hand or the specific mention of the right to life for the unborn on the other. Instead, they found that the area of abortion regulation was "peculiarly appropriate and necessary to leave to the legislature." *Id.* at 1505 (statements of Delegate Weisberg). They specifically recognized that the question represented the kind of serious medical and social problem that the constitutional convention was not equipped to study and evaluate. They wanted to exercise restraint from controlling the matter and wanted to leave it to the democratic process for resolution. Thus, there is clearly an intent at work here for our state constitution's due process clause to be construed differently on this matter than the federal constitution as construed by the United States Supreme Court in 1992 in *Casey*.

¶ 135    Justice Burke concludes that the mere fact that our due process clause remained unchanged from the 1870 Constitution means that there is "nothing" in the debates or committee reports that demonstrates that our due process clause is to be construed differently than the federal due process clause with respect to abortion. *Supra* ¶ 55. As my preceding discussion demonstrates, Justice Burke's conclusion is patently false. The framers of the 1970 Constitution clearly regarded the issue of abortion regulation as a legislative matter, not a due process matter, a position that is fundamentally at odds with the way in which the federal courts subsequently construed the federal due process clause. On this question, the two provisions simply do not mean the same thing.

¶ 136    There is nothing in the constitutional debate to suggest that the drafters were concerned specifically with conforming our state's due process clause with the federal clause. Rather, there is a comment suggesting that some wanted to keep the "existing language of the due process clause," by which the delegates meant the existing language in our state constitution of 1870, which of course was the governing constitution in effect in the State of Illinois at the time. Keeping the "existing language" meant only that they wanted to delete the words "including the unborn" that the majority of the committee had drafted. There was no intention expressed by the constitutional delegates to have the state and federal provisions interpreted similarly with respect to the question of whether the legislature should have the ultimate power to regulate abortion. Instead, the intention of the delegates, as expressed in the debate, was just the opposite. The debate indicates that the drafters intended to leave the legislature free to regulate or prohibit abortion. Again, this intent is opposite of *Casey* and *Roe*, which eradicates, or at least severely limits, a state legislature's ability to regulate or proscribe abortion.

¶ 137    Of course, "[t]he meaning of a statute or constitutional provision depends upon the intent

-33-

of the drafters *at the time of its adoption*, and it is a long-standing principle of statutory construction that it is the court's duty to ascertain and effectuate that intent." (Emphasis added.) *Sayles v. Thompson*, 99 Ill. 2d 122, 125 (1983). That the drafters of our constitution in 1970 would specifically want to leave the matter to the legislature makes perfect sense given our state history with respect to abortion law up until that time.

¶ 138 By the time of the adoption of our constitution in 1970, it had been the continuous public policy of this state for over 140 years to protect unborn human life by prohibiting abortion. From 1827 until 1973, except for a brief period between 1867 and 1874 when abortion was allowed "for *bona fide* medical or surgical purposes" (Act of Feb. 18, 1867, Ill. Laws § 89 (1867)), Illinois prohibited abortion at any stage of pregnancy unless the mother's life was endangered. See *People ex rel. Hanrahan v. White*, 52 Ill. 2d 70, 73 (1972) (citing various Illinois abortion statutes going back to 1845); see also Ill. Rev. Laws at 131 (1827); Ill. Rev. Laws at 179 (1833). After the 1970 Constitution went into effect and before *Roe* was decided, this court refused to graft psychiatric or mental-health exceptions onto the statute, specifically noting that the legislature had repeatedly rejected bills that would have allowed abortions for such reasons. *White*, 52 Ill. 2d at 73-75. When, after the United States Supreme Court decided *Roe*, this court declared the Illinois abortion law unconstitutional in *People v. Frey*, 54 Ill. 2d 28 (1973), it did so strictly on the basis of the supremacy clause in the federal constitution, and not upon any independent state ground. See Paul Benjamin Linton & Kevin J. Todd, *Abortion Under the Illinois Constitution: The Framers Did Not Incorporate a Right to Abortion*, 81 Ill. B.J. 31, 34 (1993).

¶ 139 The Illinois General Assembly repealed our pre-*Roe* abortion laws in 1973, but in 1975 enacted laws attempting to regulate abortion within the narrow parameters allowed by *Roe*. The statement of legislative intent in the Illinois Abortion Law of 1975, which intent continues to this day, provides in part as follows:

> "[T]he General Assembly finds and declares that longstanding policy of this State to protect the right to life of the unborn child from conception by prohibiting abortion unless necessary to preserve the life of the mother is impermissible only because of the decisions of the United States Supreme Court and that, therefore, if those decisions of the United States Supreme Court are ever reversed or modified or the United States Constitution is amended to allow protection of the unborn then the former policy of this State to prohibit abortions unless necessary for preservation of the mother's life shall be reinstated." 720 ILCS 510/1 (West 2010) (formerly Ill. Rev. Stat. 1977, ch. 38, ¶ 81-21).

¶ 140 In sum, I believe that delegates to the Sixth Illinois Constitutional Convention refused to recognize a right to abortion in drafting our 1970 constitution, and that is how I would construe our due process clause. Given the clear intent of the drafters of our 1970 constitution, I would reject the lockstep approach that the lead opinion employs in construing the language of our due process clause to mean the same as the federal due process clause on the subject of abortion. In the end, however, we are in unanimous agreement that the Illinois due process clause does not render the Parental Notification of Abortion Act of 1995 unconstitutional. I believe we also wind up in the same place in the event that *Casey* and *Roe* are ever overruled. If that were to happen, the lead opinion's approach would simply revert

the meaning of our due process clause to the pre-*Roe* interpretation and the matter of abortion regulation (*i.e.*, whether to regulate or prohibit it) would be left for the legislative process. Although it may seem to be an academic point, then, to conclude, as I do, that the Illinois Constitution does not contain a right to abortion, it is our solemn obligation to discern and effectuate the true intent of the drafters of our state constitution on this matter.

¶ 141     CHIEF JUSTICE KILBRIDE and JUSTICE KARMEIER join in this special concurrence.